## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| WILLIE DEE OWENS, | ) | CASE NO.  1:18CV01043 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Willie Dee Owens, ("Plaintiff" or "Owens"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his application for a Period of Disability ("POD") and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before[2] the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

[2]  On December 26, 2018, this matter was stayed due to the lapse of congressional
appropriations funding the federal government.  *See* General Order 2018-15.  The stay
was thereafter extended pursuant to General Order 2019-1.  As the government shutdown
has ended, the stay imposed by General Orders 2018-15 and 2019-1 is hereby lifted.

# I.   PROCEDURAL HISTORY

In September 2014, Owens filed an application for POD and DIB, alleging a disability onset date of January 31, 2014 and claiming he was disabled due to lumbar stenosis, bulging discs, lower back pain, and pain in his legs and feet.  (Transcript ("Tr.") 158, 201.)  The applications were denied initially and upon reconsideration, and Owens requested a hearing before an administrative law judge ("ALJ").  (Tr. 107, 115, 122.)

On June 16, 2016, an ALJ held a hearing, during which Owens, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 38.)  On June 1, 2017, the ALJ issued a written decision finding Owens was not disabled.  (Tr. 12-28.)  The ALJ's decision became final on March 2, 2018, when the Appeals Council declined further review.  (Tr. 1.)

On May 4, 2018, Owens filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 11, 13, 14.) Owens asserts the following assignments of error:

> (1)    The ALJ erred by failing to develop the record to obtain an opinion of Plaintiff's functioning following his back surgery and diagnosis of carpal tunnel syndrome, rendering his RFC determination unsupported by substantial evidence.

(Doc. No. 11.)

# II.   EVIDENCE

## A.    Personal and Vocational Evidence

Owens was born in October 1969 and was 46 years-old at the time of his administrative hearing, making him a "younger individual" under social security regulations.  (Tr. 87.)  *See* 20 C.F.R. §§ 404.1563(c).  He has a limited education and is able to communicate in English.  (Tr. 92.)  He has past relevant work as a circuit board assembler, packager, and material handler.  (Tr.

2

23.)

**B.      Medical Evidence**[3]

On April 1, 2013, Owens visit physicians' assistant Alfred J. Melillo, PA-C, reporting

lower back pain radiating into his legs since an August 2012 motor vehicle accident.  (Tr. 238.)

On examination, Owens' gait was without ataxia or antalgia.  (Tr. 239.)  He had pain with range

of motion and tenderness in his lower lumbar spine and bilateral SI joints.  (*Id*.)  He was able to

walk on his heels and toes, squat and stand without difficulty, and had full strength in his hips

and knees.  (*Id*.)  Mr. Melillo reviewed Owens' recent lumbar MRI, which revealed L4-5 and L5-

S1 foraminal narrowing and facet joint hypertrophy, with foraminal narrowing at L5-S1.  (Tr.

242.)  Mr. Melillo referred Owens for injections and advised him to take ibuprofen as needed.

(*Id*.)

Owens underwent a left-sided L4-5 medial branch block injection on April 10, 2013 and a

lumbar steroid injection on May 6, 2013.  (Tr. 245, 285.)  On June 10, 2013, Owens visited pain

management physician Edwin Capulong, M.D., reporting 50% relief from the injections.  (Tr.

281.)  On examination, Owens had pain to palpation in his spine, full strength in his legs, and a

negative straight leg raise.  (Tr. 282.)  His gait was non-antalgic and his toe and heel walking

were normal.  (Tr. 283.)  Dr. Capulong prescribed Gabapentin.  (*Id*.)

Owens returned to Dr. Capulong on February 18, 2014, reporting he was "better by

100%" since his car accident.  (Tr. 316.)  On examination, Owens was ambulatory, with full

strength in his upper and lower extremities and no pain to palpation in his paraspinals.  (Tr. 317.)

---

[3]      The Court note that its recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

3

Dr. Capulong concluded Owens was "better overall" and refilled his Neurontin.  (*Id*.)

On June 2, 2014, Owens visited Dr. Capulong, reporting worsening back pain after sustaining a lifting injury 3-4 days prior.  (Tr. 249.)  On examination, Owens had pain to palpation in his spinous process and paraspinals, with tenderness in his lumbar spine.  (Tr. 251.)  Dr. Capulong prescribed a course of steroids and Flexeril.  (Tr. 252.)  Owens returned to Dr. Capulong on June 27, 2014, indicating the steroids provided no relief and his back pain was worsening.  (Tr. 255.)  His pain was worse with standing and walking and relieved by sitting.  (*Id*.)  On examination, Owens' gait was non-antalgic, with normal heel and toe walking.  (Tr. 257.)  He had pain to palpation in his paraspinals and tenderness in his thoracolumbar spine.  (*Id*.)  Dr. Capulong ordered an MRI and increased Owens' Neurontin dosage.  (*Id*.)

A July 2, 2014 lumbar MRI revealed: (1) stable degenerative disc disease in the lower lumbar spine; (2) no focal protrusion or extrusion; and (3) stable mild to moderate neural foraminal stenosis at L3-4 through L5-S1.  (Tr. 340.)  Dr. Capulong reviewed these results with Owens on July 18, 2014.  (Tr. 261.)  Owens indicating difficulty walking and standing, with shooting pains down his legs.  (*Id*.)  On examination, Owens had full strength in his legs, normal muscle tone, and a non-antalgic gait.  (Tr. 263.)  His toe and heel walking were within normal limits.  (*Id*.)  Dr. Capulong referred Owens for another injection and a surgical evaluation.  (*Id*.)

Owens thereafter underwent a bilateral SI transforaminal injection on August 7, 2014.  (Tr. 306.)  He followed up Dr. Capulong on September 11, 2014, reporting daily pain.  (Tr. 232.)  On examination, Owens had an antalgic gait, but a stable neurologic examination.  (Tr. 232, 233.)  Dr. Capulong advised Owens to hold off on any further injections and prescribed Tramadol and Gabapentin.  (Tr. 233.)

4

On November 7, 2014, Owens had a physical therapy evaluation with physical therapist Shawn Sutton, DPT.  (Tr. 368.)  He reported right leg numbness and left leg radiculopathy.  (*Id*.)  On examination, Owens had decreased range of motion in his spine and slightly decreased strength in his left hip.  (Tr. 369.)  His sensation and knee strength were intact.  (*Id*.)  Owens was unable "to formally spring test" due to pain and guarding and his "pain and self limiting impacted the completeness of [evaluation] procedures."  (Tr. 370.)  Owens chose not to continue with physical therapy because he did not find it helpful or affordable.  (*Id*.)  Mr. Sutton advised Owens to obtain a TENS unit through his doctor.  (Tr. 370, 372.)

Owens visited the emergency room for an allergic reaction to his Tramadol on January 2, 2015.  (Tr. 300, 302.)  He returned to the emergency room on March 4, 2015, with right-sided neck pain.  (Tr. 391.)  An x-ray revealed no acute fracture, but multilevel degenerative changes in the cervical spine.  (Tr. 394.)

On March 10, 2015, Owens visited the emergency room for four days of left leg pain and numbness.  (Tr. 395.)  He was walking with crutches and reported he had fallen.  (Tr. 396, 398.)  X-rays revealed stable lumbosacral spine degenerative joint disease.  (Tr. 398.)  The emergency room physicians prescribed Norflex and Toradol.  (Tr. 397.)

Owens subsequently underwent a lumbar laminectomy and decompression on August 28, 2015.  (Tr. 346.)  Following this procedure, Owens began a course of physical therapy on November 24, 2015.  (Tr. 403.)  He indicated he was still having sharp, shooting pains and his legs had been buckling due to weakness.  (*Id*.)  He was ambulating with a cane.  (*Id*.)  On examination, Owens had a decreased spinal range of motion, decreased strength in both legs, impaired mobility, decreased flexibility, and decreased bilateral lower extremity strength.  (Tr.

5

404, 405.)  The examining physical therapist, Tracy Jenneman, SPT, recommended physical therapy 2-3 times a week for 6-8 weeks.  (Tr. 405.)

Owens attended physical therapy throughout December 2015.  (Tr. 408, 409, 410.)  During his therapy sessions, he had difficulty using stairs and continued leg numbness.  (Tr. 408, 409, 410, 414.)  On December 16, 2015, Owens was "slightly better" since his operation and was tolerating increased exercise repetitions in therapy.  (Tr. 410.)  On December 22, 2015, Owens displayed leg weakness, but he was able to complete all his physical therapy exercises and demonstrated decreased pain with seated chair flexion.  (Tr. 414.)  By December 29, 2015, Owens' strength was improving.  (Tr. 415.)

On December 22, 2015, Owens visited surgeon Matthew Levy, M.D., for a consultation regarding hand pain.  (Tr. 411.)  He reported increasing hand pain over the past year with numbness and tingling in all of his fingers.  (*Id*.)  Owens relayed while the pain was intermittent in nature, it would become severe enough on occasion that he would have trouble using a door handle.  (*Id.*)  On examination, Owens was ambulating with a cane.  (*Id*.)  He had good range of motion in his cervical spine, no atrophy in his hands, and good grip and pinch strength.  (*Id*.)  Dr. Levy advised Owens he needed therapy and ordered an EMG.  (Tr. 412.)

Owens continued to attend physical therapy for his back in January 2016.  On January 8, 2016, Owens' legs felt stronger overall, but he had a recent fall and difficulty sleeping due to pain.  (Tr. 422.)  His balance and gait speed were improved on January 13, 2016.  (Tr. 423.)  On January 15, 2016, Owens was displaying gains in strength, but leg fatigue with exertion.  (Tr. 424.)  He was tolerating longer physical therapy sessions with increased weight and repetitions.  (*Id*.)

6

On January 22, 2016, Owens reported he was experiencing pain 50% of the day and the numbness in his feet had become prominent.  (Tr. 425.)  During his physical therapy session on January 27, 2016, Owens displayed weakness while climbing a flight of stairs and his leg pain was more frequent.  (Tr. 426.)  Owens reported an episode of intense lower back pain on January 29, 2016.  (Tr. 430.)  He was able to increase his leg press weight to 60 pounds, but displayed weakness on examination.  (*Id.*)

On January 27, 2016, Owens underwent an occupational therapy evaluation for his bilateral hand pain and weakness.  (Tr. 427.)  His sensation was intact and he had a normal range of motion in his hands and fingers.  (*Id.*)  His grip strength was decreased and his 9-hole peg test and his pinch strength were abnormal.  (Tr. 427, 428.)  The occupational therapist, Nicole McHale, OT, issued Owens a pair of bilateral wrists splints to wear at night.  (Tr. 428.)

In February 2016, Owens attended both physical therapy for his back and occupational therapy for his hands.  On February 3, 2016, Owens was ambulating with a slow gait and cane.  (Tr. 431.)  He reported relief from his exercises on February 11, 2016.  (Tr. 432.)  During his February 18, 2016 occupational therapy session he was able to complete several manipulative tasks with minimal difficulty, including using a screwdriver.  (Tr. 435.)  However, he voiced complaints of weakness.  (*Id.*)

During his February 23, 2016 occupational therapy visit, his EMG results were reviewed.  (Tr. 437.)  The testing confirmed moderate carpal tunnel syndrome on the right side and mild carpal tunnel syndrome on the left.  (*Id.*)  He again was able to complete several manipulative tasks without difficulty, but he continued to report fatigue.  (*Id.*)  His occupational therapist observed Owens was making "good gains."  (*Id.*)  On March 10, 2016, he denied any pain during

7

occupational therapy and continued to make gains in strength.  (Tr. 438.)

Owens attended his seventeenth visit of physical therapy for his back on March 10, 2016.
(Tr. 439.)  He displayed difficulty using stairs and leg weakness.  (*Id.*)

On May 8, 2016, Owens presented to the emergency room with right leg pain radiating
into his feet.  (Tr. 451.)  The emergency room physicians provided him with steroids, Norflex,
and Toradol.  (Tr. 452.)

On May 10, 2016, Owens' back surgeon, Nicholas Ahn, M.D., called Owens to review
his recent lumbar MRI results.  (Tr. 457.)  The updated MRI demonstrated no evidence of
significant nerve compression or stenosis.  (*Id.*)  Dr. Ahn advised Owens he likely had neuritis,
developed after a fall when he was recovering from surgery.  (*Id.*)  Dr. Ahn recommended lumbar
epidural injections and concluded further surgery was not appropriate.  (*Id.*)

Owens returned to Dr. Levy on May 10, 2016, reporting his hand pain continued to be
severe in nature.  (Tr. 454.)  On examination, Owens had full range of motion in his wrists, finger
extension, and finger abduction.  (Tr. 456.)  He had diminished grip strength.  (*Id.*)  Dr. Levy
referred Owens for further occupational therapy, advising Owens they would discuss surgery if
he exhibited no improvement from therapy.  (*Id.*)

On May 23, 2016, Owens began another course of physical therapy for his lumbar spine.
(Tr. 461.)  He reported bilateral leg pain and foot paresthesia.  (*Id.*)  On examination, Owens had
decreased leg strength and a decreased spinal range of motion.  (Tr. 462.)  He had no "major gait
deviations."  (*Id.*)  His physical therapy evaluation was limited secondary to pain.  (*Id.*)  The
physical therapist, Shawn Sutton, PT, noted Owens' history of noncompliance and lack of
success from therapy.  (Tr. 463.)  He recommended Owens' undergo a brief trial of physical

8

therapy in order to establish a home exercise program.  (*Id.*)

On June 29, 2016, Owens attended occupational therapy for his hands.  (Tr. 469.)  He was discharged after two visits, after cancelling and failing to reschedule.  (Tr. 470.)

**C.      State Agency Reports**

On November 25, 2014, state agency physician Gerald Klyop, M.D., reviewed Owens' medical records and completed a Physical RFC Assessment.  (Tr. 90-91.)  Dr. Klyop determined Owens could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds; stand and/or walk for about six hours in an eight-hour workday; and sit for more than 6 hours on a sustained basis in an eight-hour workday.  (*Id.*)  He concluded Owens could occasionally climb ramps, stairs, ladders, ropes, or scaffolds and frequently stoop.  (Tr. 91.)

On February 2, 2015, state agency physician Abraham Mikalov, M.D., reviewed Owens' medical records and completed a Physical RFC Assessment.  (Tr. 100-101.)  Dr. Mikalov determined Owens could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour workday; and sit for more than 6 hours on a sustained basis in an eight-hour workday.  (Tr. 100.)  He concluded Owens could occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, occasionally stoop, and frequently kneel, crouch, and crawl.  (*Id.*)

**D.      Hearing Testimony**

During the June 2016 hearing, Owens testified to the following:

- He has an eighth grade education.  (Tr. 43.)  He has his drivers' license.  (Tr. 44.)  He drives his wife to and from work.  (*Id.*)  He finds driving long distances to be painful.  (*Id.*)

- He was involved in a motor vehicle accident in August 2012.  (Tr. 44.)  He continued to work until 2014, when he was laid off.  (Tr. 45.)  Prior to the layoff,

his employer was "lenient" with him – allowing him to not lift certain materials and sit for certain periods.  (Tr. 58.)

•   He has undergone back surgery.  (Tr. 59.)  Despite this operation, he continues to have pain radiating down his legs, feet, and toes.  (*Id*.)  The pain is worse when he lies down at night or if he sits too long.  (*Id*.)  He can stand and sit for 15-20 minutes without pain.  (Tr. 60.)

•   He began to use a cane after his back operation.  (*Id*.)  Physical therapy encouraged him to use it daily because his legs were giving out.  (*Id.*)  The cane was prescribed by his surgeon.  (Tr. 74.)  He has fallen once since his operation.  (Tr. 60.)  He uses his cane for walking and standing.  (*Id*.)  He uses a walker occasionally at home.  (Tr. 61.)  He also uses a TENs unit and may be undergoing back injections.  (Tr. 62.)

•   He has carpal tunnel in both hands, the left side worse than the right.  (Tr. 62-63.)  He underwent occupational therapy, which he did not find helpful.  (Tr. 63.)  He sleeps with braces at night.  (*Id*.)  He has dropped objects and has difficulty picking up objects with his fingers.  (Tr. 64.)

•   He cooks meals.  (Tr. 66.)  He does some cleaning.  (*Id*.)  His children help with the chores.  (*Id*.)

The VE testified Owens had past work as a circuit board assembler (D.O.T. #726.684-070); a packager (D.O.T. #920.587-018); and a material handler (D.O.T. #929.687-030).  (Tr. 78-80.)  The ALJ then posed the following hypothetical question:

So I'd like you to imagine a hypothetical individual with Mr. Owens' vocational profile, who is limited to the performance of light work as defined under the regulations except he can never climb ladders, ropes or scaffolds. He can occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl.  He is limited to frequent handling and fingering with the upper extremities.  And he should avoid concentrated exposure to hazards, such as dangerous machinery and unprotected heights.

(Tr. 80.)

The VE testified the hypothetical individual would be able to perform Owens' past work as a circuit board assembler, as generally performed.  (Tr. 80-81.)

10

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the

claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Owens was first insured on January 1, 2009, and remained insured through December 31, 2019, his date last insured ("DLI.")  (Tr. 87.)  Therefore, in order to be entitled to POD and DIB, Owens must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2.     The claimant has not engaged in substantial gainful activity since January 31, 2014 (20 CFR 404.1571 *et seq*.).

3.     The claimant has the following severe impairments: cervical degenerative disc disease and spondylosis; lumbar degenerative disc disease and spondylosis with radiculopathy, status post L2-5 laminectomy and decompression; bilateral carpal tunnel syndrome; and obesity (20 CFR 404.1520(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5.     After careful consideration of the entire record, the undersigned finds the

12

claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), except he can never climb ladders, ropes, or scaffolds; he can occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl; he is limited to frequent handling and fingering with the upper extremities; and he should avoid concentrated exposure to hazards, such as dangerous machinery and unprotected heights.

6.   The claimant is capable of performing past relevant work as a circuit board assembler.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.   The claimant has not been under a disability, as defined in the Social Security Act, from January 31, 2014 through the date of this decision (20 CFR.1520(f)).

(Tr. 17-24.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

13

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307

14

(7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

In his sole assignment of error, Owens argues the ALJ's RFC assessment is unsupported by substantial evidence because the ALJ failed to "obtain an opinion of [Owens'] functioning following his back surgery and diagnosis of carpal tunnel syndrome."  (Doc. No. 11 at 3.) Owens contends "there is no opinion evidence to support the ALJ's limitations regarding handling and fingering" and "physical therapy records from 2015 show a significant worsening in Plaintiff's condition such that the ALJ should have obtained an updated opinion."  (*Id*. at 17.) Owens maintains since the only opinions contained in the record are from the state agency physicians, rendered prior to his carpal tunnel diagnosis and back surgery, "the ALJ arbitrarily substituted his own opinion of [Owens'] functioning for the remaining two-year period."  (*Id*. at 18.)  Owens further asserts the ALJ "failed to consider [Owens'] use of a cane for ambulation, and failed to explain how [Owens] is capable [of] frequent handling and fingering."  (*Id*.)  Owens concludes the "ALJ should have ordered a consultative examination to determine the full extent of [Owens'] limitations."  (*Id*. at 22.)

The Commissioner maintains the "ALJ adequately developed the record and substantial evidence supports the RFC finding."  (Doc. No. 13 at 9.)  The Commissioner argues the ALJ considered the evidence following Owens' back operation and "extensively considered the

15

evidence relating to carpal tunnel syndrome." (*Id*. at 10.)  The Commissioner asserts there is no requirement for an ALJ to "discuss every piece of evidence in the administrative record." (*Id*. at 12.)  Finally, the Commissioner notes Owens "has offered no information concerning what evidence further record development could offer that would have enhanced a determination of disability, and certainly, he had opportunities to keep the record open and ask his treating medical sources for opinions, but he did not do so and agreed at the hearing that the record was complete." (*Id*. at 12-13.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).[4]  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer v. Astrue*, 774 F.Supp.2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec*., 383 Fed.Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he

---

[4]    Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

### a. RFC

Here, at step two, the ALJ determined Owens suffered from the severe impairments of "cervical degenerative disc disease and spondylosis; lumbar degenerative disc disease and spondylosis with radiculopathy, status post L2-5 laminectomy and decompression; bilateral carpal tunnel syndrome; and obesity." (Tr. 17.) After determining Owens' impairments did not meet or equal the requirements of a Listing, the ALJ proceeded, at step four, to consider the medical and opinion evidence regarding Owens' impairments. (Tr. 18-23.) Of particular relevance, the ALJ discussed Owens' allegations of lower back pain which radiated into his legs. (Tr. 19.) He acknowledged Owens' testimony he was unable to stand or sit for greater than 15-20 minutes due to pain. (*Id.*) The ALJ also acknowledged Owens had carpal tunnel syndrome and the occupational therapy for such was not helpful. (*Id.*) The ALJ discussed Owens' MRI results and back surgery. (Tr. 20.) He noted Owens had initially improved after the August 2015 surgery, but his pain had increased by April 2016. (*Id.*) The ALJ reviewed Owens' EMG testing, occupational therapy for his hands, and physical therapy for his back. (Tr. 21.) The ALJ also discussed Owens' work history and the opinions of the state agency physicians. (Tr. 22.)

17

The ALJ formulated the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b), except he can never climb ladders, ropes, or scaffolds; he can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; he is limited to frequent handling and fingering with the upper extremities; and he should avoid concentrated exposure to hazards, such as dangerous machinery and unprotected heights.

(Tr. 18.)

The Court finds the ALJ's RFC is supported by substantial evidence. As discussed *supra*, MRIs have established degenerative changes, disc protrusions, and neural foraminal narrowing in the lumbar spine. (Tr. 242, 340.) Prior to his surgery, Owens had mild to moderate neural foraminal stenosis from L3-4 through L5-S1. (Tr. 340.) However, his most recent MRI results demonstrate no evidence of significant nerve compression or stenosis. (Tr. 457.)

The medical evidence establishes Owens initially had improvement in his symptoms following his August 2015 back operation. (Tr. 345, 410, 457.) Indeed, in January 2016, Owens reported his legs felt stronger overall. (Tr. 422.) His physical therapy notes indicated continued back pain and fatigue, but gains in strength and endurance. (Tr. 424, 425, 426.) Unfortunately, Owens sustained a fall and began to have increased symptoms in early 2016. (Tr. 457.) However, the updated MRI was negative for any stenosis. (*Id*.) His surgeon, Dr. Ahn, concluded he likely had developed neuritis and advised Owens no further surgery was warranted. (*Id*.) Dr. Ahn recommended Owens undergo additional lumbar epidural injections for his symptoms. (*Id*.) Physical therapy treatment notes confirmed decreased strength in his legs and a reduced range of motion in his spine, but no sensory deficits and improvement in his endurance and strength. (Tr. 462, 424, 430.)

As for Owens' carpal tunnel syndrome, Owens initially sought treatment for hand pain and weakness in December 2015, nearly two years after his alleged date of onset.  (Tr. 411.)  Dr. Levy, a hand surgeon, noted Owens had good grip and pinch strength.  (*Id*.)  EMG results confirmed bilateral carpal tunnel syndrome, moderate on the right side and mild on the left.  (Tr. 437.)  From January 2016 through March 2016, Owens attended four sessions of occupational therapy for his hands.  (Tr. 427, 434, 437.)  He displayed weakness and fatigue on examination.  (Tr. 430, 437.)  However, by March 10, 2016, he denied any hand pain and was making gains in strength.  (Tr. 438.)  Owens followed up with Dr. Levy in May 2016, reporting severe hand pain.  (Tr. 454.)  Dr. Levy noted a full range of motion in Owens' wrists and fingers, but diminished grip strength.  (Tr. 456.)  Owens then attended two more occupational therapy sessions, but was eventually discharged due to non-compliance.  (Tr. 469, 470.)  Owens has not undergone carpal tunnel release surgery.  The ALJ noted many of these objective findings and discussed Owen's back operation and the diagnostic testing in the decision.  (Tr. 19-21.)  The ALJ also accounted for Owens' allegations of pain and paresthesia, by limiting him to light work with many postural, environmental, and manipulative restrictions.  (Tr. 18.)

Owens argues there are several physical therapy treatment notes contained in the treatment record which are "highly probative of [his] condition following[5] his surgery."  (Doc.

---

[5]    In addition, Owens references the discharge summary provided to him after his surgery, which contained several lifting, pushing, pulling, and bending restrictions.  (Doc. No. 11 at 19-20, Tr. 346.)  It also instructed him not to drive or return to school until his follow-up visit with his surgeon.  (Tr. 346.)  The ALJ afforded these limitations little weight, finding the "most reasonable inference from the context of these instructions is that they are temporary restrictions not intended to limit the claimant for more than a short period."  (Tr. 23.)  Owens argues the "assumption that the restrictions were temporary is not substantial evidence to support [the ALJ's] RFC determination."  (Doc. No. 11 at 20.)

No. 11 at 19.)  However, he does not explain what specific limitations should have been included in the RFC due to this medical evidence.  Indeed, the RFC limited Owens' ability to stand, walk, lift, and carry, thus reflecting his strength and fatigue deficits.  (Tr. 18.)  Moreover, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001).  Indeed, the Sixth Circuit has made clear an ALJ's decision "cannot be overturned if substantial evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 477 (6th Cir. 2003).  In this case, the ALJ clearly articulated his reasons for finding Owens capable of performing work as set forth in the RFC and these reasons are supported by substantial evidence.

Owens also argues the RFC is in error because it is not supported by any medical opinion in the record.  Specifically, Owens asserts "the Sixth Circuit requires[6] a medical opinion to support the RFC unless the evidence shows very little impairment."  (Doc. No. 14 at 5.)  This is an incorrect reading of Sixth Circuit law.  In fact, the Sixth Circuit has specifically rejected

---

However, as discussed *supra*, notwithstanding this discharge summary, there is substantial evidence to support the ALJ's RFC assessment.  Owens does not raise or assert a separate opinion evidence argument, nor is it clear who even placed these restrictions upon Owens.  Thus, the Court will not address these discharge summary restrictions any further.  *See McPherson v. Kelsey*, 125 F.3d 898, 995-996 (6th Cir. 1997)("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

[6]    In support of this argument, Owens does not cite to any Sixth Circuit case law, instead relying on a case from the Eastern District of Michigan, *Guido v. Comm'r of Soc. Sec*., 2014 WL 4771929, *12 (E.D. Mich. Sept. 24, 2014).  (Doc. No. 14 at 5.)

20

such an argument, finding "the Commissioner has final responsibility for determining an individual's RFC . . . and to require the ALJ to base her RFC finding on a physician's opinion 'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'" *Rudd v. Comm'r of Soc. Sec.*, 531 Fed App'x 719, 728 (6th Cir. 2013).  *See also Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 Fed. App'x 395, 401 (6th Cir. Apr. 30, 2018)("We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ."); *Shepard v. Comm'r of Soc. Sec.*, 705 Fed App'x 435, 442-443 (6th Cir. Sept. 26, 2017).

Owens also argues the ALJ improperly relied on the opinion of the state agency physician, Dr. Mikalov, because the ALJ "utterly failed to properly consider" the evidence submitted after Dr. Mikalov rendered his February 2015 opinion.  (Doc. No. 14 at 2.) Specifically, Owens asserts the ALJ did not provide a detailed discussion of several of his physical therapy treatment notes or note Owens' fatigue during his occupational therapy sessions. (Doc. No. 11 at 19-20.)  However, an "ALJ need not discuss every piece of evidence in the administrative record so long as he or she considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence."  *Haines v. Berryhill*, 2018 WL 1377853, *5 (N.D. Ohio Mar. 19, 2018)(citing 20 CFR §404.1545(a)(2)).  Moreover, it is proper for an ALJ to credit a state agency consultant's opinion when it is "supported by the totality of evidence in the record, and the ALJ considered the evidence obtained after the consultant issued his opinion."  *Myland v. Comm'r of Soc. Sec.*, 2017 WL 5632842 at *2 (6th

Cir. Nov. 13, 2017).  *See also Ruby v. Colvin*, 2015 WL 1000672 at *4 (S.D. Ohio Mar. 5, 2015)("[S]o long as an ALJ considers additional evidence occurring after a state agency physician's opinion, he has not abused his discretion."); *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error where the ALJ considered the evidence developed post-dating those opinions).

Here, the ALJ's decision demonstrates he considered the entire record.  In the decision, the ALJ included a detailed discussion of the evidence post-dating Dr. Mikalov's opinion, including Owens' back surgery, his development of neuritis, his reports of continued back pain at his physical therapy appointments, and the treatment and evaluation of his carpal tunnel, including diminished grip strength and a positive EMG.  (Tr. 20-21.)  Moreover, as the RFC is supported by substantial evidence, the ALJ's decision not to provide a detailed discussion of each of Owens' occupational and physical therapy visits does not provide a basis for remand.

### b.  Cane

The Court further finds substantial evidence supports the ALJ's decision to not provide a limitation for a cane in the RFC.  In the decision, the ALJ acknowledged Owens' testimony he had "been using a cane to walk since his back surgery" and occasionally "used a walker."  (Tr. 19.)  In his review of the treatment notes, the ALJ noted Owens ambulated with a cane during an emergency room visit following his back operation.  (Tr. 20.)  However, Owens' testimony does not qualify as "medical documentation establishing the need" for a cane under SSR 96-9p.[7]

---

[7]  Social Security Ruling 96–9p addresses the use of an assistive device in determining RFC and the vocational implications of such devices:

*Mitchell v. Comm'r of Soc. Sec.*, 2014 WL 3738270, *12 (N.D. Ohio July 29, 2014); *Parrish v. Berryhill*, 2017 WL 2728394, *12 (N.D. Ohio June 8, 2017), *report and recommendation adopted by* 2017 WL 2720330 (N.D. Ohio June 23, 2017).

While Owens objects to the fact the ALJ only mentioned his cane twice in the decision, the ALJ's brief mention of the cane is consistent with the medical evidence.  The bulk of Owens' medical records do not document a need for a cane.  Indeed, many of his physical therapy visits do not mention his cane at all.  (Tr. 408, 409, 410, 414, 415, 422.)  In June 2014 and July 2014, Dr. Capulong observed Owens had a nonantalgic gait and made no reference to a cane.  (Tr. 257, 263.)  In January 2016, Owens' gait speed was improving and no cane was noted.  (Tr. 423.)  During a May 2016 physical therapy evaluation, he had no "major gait deviations."  (Tr. 462.)

The Court acknowledges there are several cited treatment notes which do reference Owens' cane.  Owens was ambulating with a cane during his November 2015 physical therapy evaluation, a December 2015 visit with Dr. Levy, a February 2016 physical therapy visit, and a May 2016 emergency room visit.  (Tr. 403, 411, 431, 452.)  However, these treatment notes do

---

**Medically required hand-held assistive device:** To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96–9p, 1996 WL 374185, *7 (S.S.A. July 2, 1996).

not provide any further explanation or description as to Owens' use of a cane. SSR 96-9p makes clear that in order for an ALJ to find a hand-held assistive device is medically required, there must be not only documentation of the need for a cane, but also the circumstances for which it is needed; the record in the present case fails to meet this standard. *See Brewer v. Comm'r of Soc. Sec.*, 2011 WL 7546792, *10 (E.D. Mich. Dec. 11, 2011)("These references to a cane were only peripherally noted in the medical records as a mere visual observation by a physician of his patient and they cannot be construed as demonstrating Plaintiff's need for a cane."), *report and recommendation adopted by* 2012 WL 899341 (E.D. Mich. Mar. 16, 2012).

Owens asserts the ALJ "made no findings whether this prescribed assistive device was necessary, and the circumstances where [Owens] would be permitted to use it in the workplace." (Doc. No. 11 at 23.) However, the ALJ did make a finding the cane was not necessary, as it was not listed as a limitation in the RFC. Moreover, the ALJ was not required to provide a detailed discussion as to what circumstances Owens would need to use the cane. Indeed, the burden is always upon a claimant to present evidence of his disability. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.").

Finally, Owens argues the ALJ "failed to obtain treatment notes" from his surgeon, Dr. Ahn. (Doc. No. 11 at 24.) Owens asserts since it was Dr. Ahn who had prescribed him the cane, his treatment notes would "have shed light on [Owens'] medical need for a cane." (*Id.*) The Court is not persuaded by this argument. While it is the ALJ's duty to fully develop the administrative record, an ALJ is permitted to presume a claimant represented by counsel has presented the best case before the ALJ. *See Lashley v. Sec'y of Health & Human Servs.*, 708

24

F.2d, 1048, 1051–52 (6th Cir.1983); *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 549 (6th Cir.2002). Ultimately, "[t]he burden of providing a complete medical record rests with the claimant." *Weeks v. Shalala*, 1995 WL 521156, at *2 (6th Cir. Sept.1, 1995) (Table).

Here, Owens was represented by counsel at his administrative hearing. (Tr. 38.) During the hearing, counsel assured the ALJ there was "a complete record in Mr. Owens' case." (Tr. 40.) She did not request the ALJ keep the record open for any additional medical opinions or records. (Tr. 86.) Thus, the ALJ was not provided with any indication there were outstanding medical records from Dr. Ahn which could have shed light on Owens' allegations. It was therefore reasonable for the ALJ to presume the record before him was complete. *Campbell v. Comm'r of Soc. Sec.*, 2013 WL 1908145, *8 (N.D. Ohio May 7, 2013)("Although the ALJ has the duty to develop the record, such a duty does not permit a claimant, through counsel, to rest on the record and later fault the ALJ for not performing a more exhaustive investigation."). *See also Elam v. Astrue*,, 2012 WL 2409218, at *8 (S.D.Ohio June 26, 2012), *report and recommendation adopted*, 2012 WL 4483422 (S.D.Ohio Sept.27, 2012); *Willaman v. Comm'r of Soc. Sec.*, 2013 WL 877126, *7 (N.D. Ohio Mar. 7, 2013).

### c. Consultative Examiner

Owens also asserts the ALJ should have ordered a consultative examination because there were no opinions on his manipulative limitations and no "opinion from a medical professional who assessed the full record." (Doc. No. 11 at 21-22.) The Commissioner asserts the ALJ adequately developed the record. (Doc. No. 13 at 9.)

An ALJ "has discretion to determine whether further evidence, such as additional testing or expert testimony is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir.2001)

(citing 20 C.F.R. § 416.917).  While the ALJ has the responsibility to make a full inquiry into the issues prior to making a disability determination, a "'[f]ull inquiry' does not require a consultative examination at government expense unless the record establishes that such an examination is necessary to enable the administrative law judge to make the disability decision." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir.1986).  Morever, an ALJ is not required to order a consultative examination if there is a considerable amount of medical evidence in the record concerning a claimant's impairments and the resulting functional capacity. *See Robertson v. Comm'r of Soc. Sec.*, 513 F. Fed.Appx. 439, 441 (6th Cir. 2013) (finding that, because the record contained test results, physicians' notes, opinion evidence from multiple physicians, and lacked any significant inconsistencies in the evidence, the ALJ was not obligated to order a consultative examination with a cardiologist or obtain additional medical record); *Foster*, 279 F.3d at 355 ("[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination.")

The Court finds the ALJ was not required to order a consultative examination because there was sufficient evidence in the record for the ALJ to make a disability determination.  With respect to Owens' carpal tunnel syndrome, the ALJ reasonably relied on the medical treatment notes, objective findings upon examination, and the EMG findings in formulating the manipulative limitations contained in the RFC assessment.  (Tr. 18-21.)  While there is no examining source opinion regarding Owens' carpal tunnel syndrome, the ALJ discussed the occupational therapy notes which indicated Owens' strength and pain levels were improving with therapy.  (Tr. 21.)  Similarly, while there is no medical opinion regarding Owens' physical

26

capacity following his August 2015 back surgery, the record contained enough evidence for the ALJ to make a decision. This evidence includes physical therapy notes, emergency room visits, an updated MRI, and the treatment recommendations of his surgeon, Dr. Ahn. (Tr. 414, 415, 451, 457, 461.) Indeed, the ALJ acknowledged Owens' increased pain following his operation and noted Owens was "very limited by his severe neck and back impairments, which are complicated by carpal tunnel syndrome and obesity, as indicated in the highly restrictive residual functional capacity found herein." (Tr. 20, 22.) It was not the ALJ's burden to obtain further medical opinion evidence on Owens' physical capacity. *See Leflouria v. Berryhill*, 2018 WL 3105943, *8 (N.D. Ohio Jan. 16, 2018)("There is no requirement that the ALJ call a medical expert or order a consultative examination due to Plaintiff's failure to submit opinion evidence."), *report and recommendation adopted*, 2018 WL 1100761 (N.D. Ohio Mar. 1, 2018); *Boughner v. Comm'r of Soc. Sec.*, 2017 WL 2539839, *9 (N.D. Ohio May 22, 2017), *report and recommendation adopted by* 2017 WL 2501073 (N.D. Ohio Jun. 9 2017)("plaintiff bears the burden of proof to establish her limitations; any failure to produce medical opinions ultimately works against the merits of her claim."). Moreover, Owens, who was represented by counsel at the hearing, did not request a consultative examination or otherwise suggest the medical record was insufficient for the ALJ to make a disability determination. *See Murphy v. Comm'r of Soc. Sec.*, 2016 WL 4530612, *3 (N.D. Ohio Aug. 30, 2016)("the decision as to whether a consultative examination should be conducted is a discretionary one, and depends on a predicate finding of the ALJ that the record is insufficient to properly evaluate the claim."). Accordingly, the ALJ did not abuse his discretion by failing to order a consultative physical examination.

In sum, the Court finds the ALJ's RFC assessment is supported by substantial evidence.

Moreover, the Court finds the ALJ was not required to obtain an updated opinion on Owens' functional capabilities.

Accordingly, and for all the reasons set forth above, Owens' assignment of error is without merit and does not provide a basis for remand.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

_s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: February 13, 2019

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  _See United States v. Walters_, 638 F.2d 947 (6th Cir. 1981); _Thomas v. Arn_, 474 U.S. 140 (1985), _reh'g denied_, 474 U.S. 1111 (1986).**